# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

———————————————

Nº 10-cv-4645 (JFB) (WDW)

———————————————

ROBERTA WEISBECKER,

Plaintiff,

VERSUS

SAYVILLE UNION FREE SCHOOL DISTRICT, ROSE CASTELLO, AND ROSEMARY F. JONES,

Defendants.

———————————————

**MEMORANDUM AND ORDER**
September 12, 2012

———————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Roberta Weisbecker ("Weisbecker" or "plaintiff") commenced this action against Sayville Union Free School District ("School District"), Rose Castello ("Castello"), and Rosemary Jones ("Jones"), alleging that the School District discriminated against her on the basis of her gender in violation of Title VII of the Civil Rights Act, and that all defendants discriminated against her on the basis of her gender in violation of the New York State Human Rights Law. In particular, plaintiff alleges that, after she became pregnant, the School District discriminated against her by recommending that the Board of Education terminate her employment. Principal Rose Castello conducted the investigation, and Superintendent Jones made the recommendation of termination to the Board, which allegedly caused plaintiff to

resign before the Board voted on the issue. Plaintiff seeks compensatory and punitive damages, and attorneys' fees and other costs.

The defendants now move for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court grants the defendants' motion for summary judgment on the Title VII claim, and declines to exercise supplemental jurisdiction over the state law claims.

First, plaintiff has failed to provide any evidence from which a rational juror could find an adverse employment action for purposes of Title VII. It is uncontroverted that, although plaintiff was given the opportunity to request Superintendent Jones' reasons for recommending termination and then provide a responsive statement to the

Board before the vote on termination, plaintiff instead chose to resign. This threat of termination alone, in form of a recommendation by the Superintendent to the Board, does not, by itself constitute an adverse employment action. Although plaintiff attempts to point to a Superintendent note from a Board meeting that it was "okay to terminate" plaintiff, that notation has no legal significance where it is clear that plaintiff still had the right to contest the recommendation of termination and, instead, chose to resign. Similarly, no constructive discharge claim can survive summary judgment because plaintiff was on maternity leave at the time of recommendation for termination. Thus, no rational jury could conclude that she was forced to resign, rather than contest the recommendation, because of intolerable working conditions.

In any event, even assuming *arguendo* that plaintiff could establish an adverse employment action, no rational jury could find that the School District's decision regarding her termination was a pretext for gender discrimination because she took maternity leave. The School District has articulated a non-discriminatory reason for the recommendation that plaintiff be terminated – namely, her failure to complete, or provide for the efficient completion of, the second trimester report cards before plaintiff's leave. Plaintiff has pointed to no evidence from which a rational jury could find that this reason was pretext for gender discrimination. It is uncontroverted that Kara Varga, who was the teacher assigned to teach plaintiff's class after she went on leave, complained that plaintiff did not leave her with the information needed to complete the student's grades for the report card. It is also uncontroverted that Superintendent Jones made the recommendation to terminate after learning from defendant

Castello (the Principal) that the report cards were not completed by plaintiff and that many of the necessary assessments needed to obtain rubric grades for the report cards also were not completed by plaintiff. Although plaintiff disagrees with the thoroughness and results of Castello's investigation, there is absolutely nothing in the record from which a rational jury could conclude that the investigation by Castello or recommendation by Jones was motivated by gender discrimination because of plaintiff's maternity leave. In fact, with respect to Principal Castello, the following facts are uncontroverted: (1) Castello, at a time when she was aware in May 2008 that plaintiff wanted to get pregnant again, recommended plaintiff to be promoted to a vacant probationary position for the 2008-09 year, which plaintiff then obtained; (2) at the end of the 2007-2008 school year, plaintiff sent a handwritten note to Castello stating, "Thank you for a great year. You have always been supportive of me and I really appreciate it. . . ."; (3) in or about January 2009, prior to plaintiff commencing her maternity leave in February 2009, Castello personally knitted a baby blanket for plaintiff's expected child; and (4) on February 12, 2009 (which was the day before plaintiff's maternity leave), Castello met with plaintiff and advised plaintiff that her teaching evaluations were good and that she was on track for tenure. Given these uncontroverted facts, no rational jury could possibly conclude that Castello's later investigation of plaintiff's failure to complete grading information before taking her maternity leave was based on gender discrimination. Similarly, to the extent plaintiff attempts to argue that Superintendent Rosemary Jones harbored such discriminatory animus, there is also not a scintilla of evidence in the record that could support such a finding by a rational jury. As noted above, it is undisputed that

Jones was told by Castello that plaintiff failed to complete the grades before talking her maternity leave, and Jones concluded that such failure by plaintiff (as reported to Jones) was sufficient to warrant a recommendation of termination. In short, even construing the evidence in the record in the light most favorable to plaintiff, there is absolutely nothing in the record to suggest that Jones' recommendation was a pretext for gender discrimination. Accordingly, plaintiff's Title VII claim cannot survive summary judgment.

## I. BACKGROUND

### A. Factual Background

The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the parties' respective Rule 56.1 Statements of Facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005). Unless otherwise noted, where a party's 56.1 Statement is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.[1]

### 1. The Parties' Work Histories in the School District

Defendant Jones is the former Superintendent of Schools for the School District. (Defs.' 56.1 ¶ 1.) Jones held that position from July 1, 2003 until June 30, 2010. (*Id.* ¶ 2.) Defendant Castello is the Principal of the Sunrise Drive Elementary School ("Sunrise Drive") in the School District, and has held that position since 2001. (*Id.* ¶ 3.)

Prior to Castello working at Sayville Union Free School District, Castello and plaintiff's sister worked together in Massapequa Union Free School District. (*Id.* ¶ 6.) After Castello came to Sayville Union Free School District, plaintiff's sister inquired of Castello about the possibility of the Sayville Union Free School District hiring plaintiff as a teacher. (*Id.* ¶ 7.) Castello advised plaintiff's sister that she should tell plaintiff to send her resume to the District's Director of Personnel, Rosemary Camilleri ("Camilleri"). (*Id.* ¶ 8.)

Plaintiff was hired by the School District as a leave replacement in the 2004-2005 school year to cover for a kindergarten teacher who was taking a pregnancy leave of absence at that time.[2] (*Id.* ¶ 9.) Plaintiff is certified to work as an elementary school teacher in any grade between kindergarten and sixth grade.[3] (*Id.* ¶ 10.) During the 2005-2006 school year, plaintiff worked as a leave replacement for a kindergarten class. (*Id.* ¶ 23.) Plaintiff was assigned to Room 112 for the 2005-2006 school year. (*Id.* ¶ 24.) During the 2006-2007 school year, plaintiff worked as a leave replacement for a kindergarten class. (*Id.* ¶ 25.) Plaintiff was assigned to Room 112 for the 2006-2007 school year. (*Id.* ¶ 26.) At the end of the 2006-2007 school year, plaintiff sent a letter to Castello thanking her for her support and expressing that she was looking forward to second grade the next year. (*Id.* ¶ 27.)

---

[1] In addition, although the parties' Rule 56.1 Statements contain specific citations to the record to support their statements, the Court has cited to the Rule 56.1 Statements, rather than the underlying citation to the record, when utilizing the 56.1 Statements for purposes of this summary of facts.

[2] A "leave replacement" is someone who takes over an "encumbered" position for a period of time. (Defs.' 56.1 ¶ 12.) A leave replacement does not have tenure rights. (*Id.* ¶ 14.)

[3] Plaintiff may be assigned to teach different grades within her certification area depending on the needs of the building. (Defs.' 56.1 ¶ 11.)

Plaintiff was assigned to work as a second grade teacher for the 2007-2008 school year. (*Id.* ¶ 28.) At that time, Gina Romano, a teacher at Sunrise Drive, had been taking a leave of absence since the 2005-2006 school year as a result of the birth of her two children.[4] (*Id.* ¶ 29.) Castello sent a memo to Camilleri recommending plaintiff for the position. (*Id.* ¶ 31.) Following Castello's recommendation, plaintiff was hired by the School District as a leave replacement for Romano. (*Id.* ¶ 32.)

### 2. Plaintiff's First Pregnancy

In or about the fall of 2007, plaintiff became pregnant. (*Id.* ¶ 33.) Plaintiff was expected to give birth sometime around June 2008. (*Id.* ¶ 34.) According to plaintiff, she announced her pregnancy around December 2007. (Weisbecker Declaration ("Weisbecker Decl.") ¶ 27.) According to plaintiff, when plaintiff told Castello about her pregnancy, Castello told plaintiff it was "good timing" because plaintiff was due in June. (*Id.* ¶ 28.) According to plaintiff's declaration and deposition testimony, Castello also stated that leaves of absence disrupt the flow of the classroom, and that she preferred for teachers to take extended leaves of absence when on maternity leave to avoid multiple transitions in the same year. (Weisbecker Decl. ¶ 29; Ex 1, Weisbecker Deposition Transcript ("Weisbecker Dep."), at 231.)

Although plaintiff had been hired to work the entire 2007-2008 school year, she worked only part of that year because her baby passed away in late January or early February 2008. (Defs.' 56.1 ¶ 35.) According to plaintiff's declaration, she

used three weeks of sick time to recover. (Weisbecker Decl. ¶ 35.) According to Castello's declaration and plaintiff's deposition, once plaintiff was cleared by her doctors to have another baby, plaintiff was open with everyone that she wanted to get pregnant again.[5] (Castello Declaration ("Castello Decl.") ¶ 18; Defs.' Ex 1, Weisbecker Dep., at 56.)

### 3. Plaintiff's Probationary Teaching Appointment

On May 21, 2008, Castello sent a memo to Camilleri recommending plaintiff for a probationary position for the 2008-2009 school year.[6] (Defs.' 56.1 ¶ 39.) Castello recommended that plaintiff be appointed to the vacant position after a third grade teacher, Lori Falco, requested a transfer to another elementary school in the School District.[7] (*Id.* ¶ 41.) Following Castello's

---

[4] Gina Romano was ultimately granted a leave of absence of six years from her position. (Defs.' 56.1 ¶ 30.)

[5] In plaintiff's declaration, she states that she did not tell others that she intended to get pregnant again, but that she believes it was understood that once she was medically cleared, she would be able to try to get pregnant again. (Weisbecker Decl. ¶ 46.)

[6] A teacher who is appointed to a "probationary position" may become eligible for tenure upon the successful completion of the probationary period. (Defs.' 56.1 ¶ 16.) A probationary teacher cannot be terminated by the board of education until certain procedural steps have been taken as required by the Education Law. (*Id.* ¶ 17.) Under Education Law § 3031(a), when a superintendent of schools makes a recommendation to a board of education that a probationary teacher should not be given tenure or that his or her probationary appointment is being terminated, the probationary teacher has a right to request that the superintendent provide him or her with the reason(s) for the superintendent's recommendation in writing. (*Id.* ¶ 18.) Once provided with the written explanation, the probationary teacher may then submit a written response. (*Id.* ¶ 19.) The superintendent's written explanation and the probationary teacher's response are then presented to the board of education for consideration when making its final determination whether or not to grant the probationary teacher tenure. (*Id.* ¶ 20.)

[7] Falco told Castello that, although she did not wish to leave Sunrise Drive, the starting and ending times

recommendation, plaintiff was appointed as a probationary teacher for the following school year. (*Id.* ¶ 46.) At the end of the 2007-2008 school year, plaintiff sent a handwritten note to Castello stating the following: "Thank you for a great year. You have always been supportive of me and I really appreciate it . . . ." (*Id.* ¶ 47.)

### a. Assignment to Kindergarten

Plaintiff was assigned a kindergarten class for the 2008-2009 school year. (*Id.* ¶ 48.) According to plaintiff's declaration, in May 2008, she learned that she was going to be assigned to second grade. (Weisbecker Decl. ¶ 43.) Her declaration states that she received a memorandum in the middle or end of June showing that her assignment to second grade had been crossed out and replaced with kindergarten. (*Id.* ¶ 48.) Plaintiff was given the kindergarten assignment because Castello believed that Heather Heuer ("Heuer"), the individual who had previously taught the kindergarten class plaintiff also had taught, had become stagnant in that position.[8] (Defs.' 56.1 ¶ 49.) Castello assigned Heuer to second grade for the 2008-2009 school year. (*Id.* ¶ 50.)

After Castello decided to move Heuer to second grade, another kindergarten teacher, Andrea Nocito ("Nocito"), asked Castello if she could have the kindergarten classroom that had been used by Heuer.[9] (*Id.* ¶ 56.)

Nocito is a senior kindergarten teacher with seven years of experience at Sunrise Drive. (*Id.* ¶ 57.) Castello granted Nocito's request. (*Id.* ¶ 58.) All of the classrooms in Sunrise Drive are essentially the same size, except for four rooms, two of which are kindergarten rooms. (*Id.*¶ 59.) The room to which plaintiff was assigned during the 2008-2009 school year was the same size as almost all of the other classrooms in the building. (*Id.* ¶ 61.) The room, Room 112, was also the room in which plaintiff had previously taught during the 2005-2006 and 2006-2007 school years. *See supra*. According to plaintiff's declaration, she was placed in the smallest of the three kindergarten classrooms despite having the largest enrollment of the three classes. (Weisbecker Decl. ¶ 53.)

### b. Student with Down Syndrome

During the 2008-2009 school year, M.N., a student with Down Syndrome, was assigned to plaintiff's class. (Defs.' 56.1 ¶ 63.) According to Castello's declaration, she had very little information about M.N. before the school year began. (Castello Decl. ¶ 30.) Castello states that, prior to entering the School District, M.N. had not been classified by the Committee on Preschool Special Education as a student with special needs, as M.N.'s mother did not seek these services for M.N. (*Id.*) Castello states further that M.N.'s mother did not send M.N. to pre-kindergarten screening, a process where school psychologists evaluate students and have an opportunity to assess their needs. (*Id.*) According to Castello's declaration, even after M.N. started kindergarten, M.N.'s mother refused to allow M.N. to be classified as special education, and therefore

---

[8] According to plaintiff's declaration, when she asked Castello why she was being moved from second grade to kindergarten, she was told that Castello "needed to move Heather Heuer out of kindergarten into second grade and [plaintiff] into kindergarten." (Weisbecker Decl. ¶ 49.)

[9] In plaintiff's response to defendants' 56.1 statement, plaintiff "admit[s] but den[ies] the truth of the statement." (Pl.'s 56.1 Counter Statement ¶ 56.) As plaintiff has set forth no evidence in the record to

refute this fact, and actually states that she admits this fact, the Court deems this fact admitted by plaintiff. Whenever the plaintiff interposes this response to a paragraph in defendants' 56.1 statement, the Court deems the facts within that paragraph to be admitted.

receive services. (*Id.* ¶ 31.) Castello cannot unilaterally assign a student a one-on-one aide or special education placement absent parental consent or until the Committee on Special Education meets to discuss the student's needs. (Defs.' 56.1 ¶ 70.)

According to Castello's declaration, once Castello learned of the situation with M.N., she notified the superintendent of schools and asked Mary Bohleber ("Bohleber"), the chairperson of the School District's Committee on Special Education, and others to assist in ensuring that M.N. received the services M.N. deserved. (Castello Decl. ¶ 32.) Castello states that she also spoke with M.N.'s mother and successfully convinced her that M.N. should be placed in a special education setting. (*Id.*)

According to plaintiff's declaration, prior to the school year starting, plaintiff was informed by Dr. Cara Donaldson ("Donaldson"), the school psychologist, that a student with Down Syndrome was placed in her class. (Weisbecker Decl. ¶ 54.) Weisbecker states that M.N. did not have any special education services, was not toilet-trained, and was non-verbal. (*Id.*) Weisbecker states that Donaldson informed her that she had been "involved in his situation" and told plaintiff "that the administration was aware for [sic] his need of services." (*Id.*) According to plaintiff's declaration, on the first day of school she spoke with Castello, who informed plaintiff that she called Jones. (*Id.* ¶ 55.) According to plaintiff's declaration, when she asked Castello why M.N. was placed in her classroom, Castello explained, "This was just the way the class got divvied out." (*Id.* ¶ 57.) According to plaintiff's declaration, she stated that she spoke with M.N.'s parents, who were not against special education support services, but that they did not want their son in a self-contained special

education classroom. (*Id.* ¶ 58.) Plaintiff further states that, on the second day of school, Jones, Bohleber and Castello came to her classroom to observe "the situation with M.N." (*Id.* ¶ 59.) According to plaintiff's declaration, Jones stated, "It's a really hard situation you are in, and you're doing a really great job dealing with it. This has never happened before." (*Id.*)

On or about October 7, 2008, M.N. was placed in a special education classroom for the first three hours and forty minutes of the school day with a special education teacher, Maureen Foster ("Foster"). (Defs.' 56.1 ¶ 73.) That same day, M.N. received a one-on-one aide for the two hours that he was in a general education classroom as a part of plaintiff's class. (*Id.* ¶ 74.) After Foster's class, M.N. would go home for lunch with his mother and would return to school at approximately 1:30 p.m. (*Id.* ¶ 75.)

c. Kindergarten Aide Time

For approximately the first month of the 2008-2009 school year, plaintiff's class was assigned to an activity outside the classroom at the time the general kindergarten aide was assigned to plaintiff's classroom. (Defs.' 56.1 ¶ 77.) Castello changed plaintiff's class schedule so that, after October 7, 2008, plaintiff's students remained in her classroom while the aide was in the room. (*Id.* ¶ 78.) According to plaintiff's declaration, this change occurred after a parent complained. (Weisbecker Decl. ¶ 63.)

4. Plaintiff's Second Pregnancy

Throughout the 2008-2009 school year, plaintiff's classroom work was satisfactory. (Defs.' 56.1 ¶ 80.) According to plaintiff's "Sayville Public Schools Teacher Observation Form," she received "Meets District Standards" assessments or the level

higher. (Pl.'s Ex. D, Sayville Public Schools Teacher Observation Form.)

Shortly after plaintiff started working as a probationary teacher in the 2008-2009 school year, she announced she was pregnant. (Defs.' 56.1 ¶ 81.) Plaintiff worked from the first day of school in September 2008 through Friday, February 13, 2009. (*Id.* ¶ 82.) According to plaintiff's declaration, she was due to deliver her baby on February 23, 2009, but her doctor informed her on February 12, 2009 that the doctor would try to arrange a Caesarean section delivery on February 14, 2009. (Weisbecker Decl. ¶ 86.)

In or about January 2009, prior to plaintiff commencing her leave, Castello personally knitted a baby blanket for plaintiff's expected child.[10] (Defs.' 56.1 ¶ 84.) Plaintiff wrote a handwritten note to Castello thanking her for the blanket. (*Id.* ¶ 85.)

5. Plaintiff's Departure on Maternity Leave

According to plaintiff's declaration, she learned that Kara Varga ("Varga") would be her leave replacement while she was on leave. (Weisbecker Decl. ¶ 66.) Once plaintiff knew that Varga was going to be her leave replacement, plaintiff gave her an open invitation to visit the class or contact her about any questions or concerns. (Pl.'s 56.1 ¶ 356.) Varga visited plaintiff's class several times. (*Id.* ¶ 358.)

According to plaintiff's declaration, she met with Varga during one of these visits and went over report card comments. (Weisbecker Decl. ¶ 85.) Plaintiff states that

Varga took notes in a notebook of the comments for each student, but these comments were not final because they still had to be inputted into the computerized report card. (*Id.*) Plaintiff also states that she wanted to ensure that the comments that Varga was going to put on the report cards reflected what she saw from the students in the class. (*Id.*)

According to Varga's declaration, plaintiff never spoke with Varga about the student report cards for the second trimester. (Varga Declaration ("Varga Decl.") ¶ 8.) Varga states that, at no point prior to plaintiff taking leave, did she talk to Varga or provide Varga with any comments that could be used on student report cards. (*Id.*) Varga states that at no point did plaintiff show Varga where she kept any of her student assessments to be used in preparing student report cards. (*Id.*) Varga assumed that, like most teachers, all of the results of the assessments would be kept in a gradebook. (*Id.*) Varga states that, prior to plaintiff commencing her leave of absence, plaintiff provided Varga with a copy of the grade book. (*Id.* ¶ 9.) Varga states, however, that plaintiff had not completed many of the second trimester assessments of her students prior to going out for her leave of absence. (*Id.*)

On February 12, 2009, the next to last day before plaintiff left for her leave, Castello met with plaintiff in Castello's office. (Defs.' 56.1 ¶ 95.) At the meeting, Castello advised plaintiff that her teaching evaluations were good and that she was on track for tenure.[11] (*Id.* ¶ 96.) Castello complimented plaintiff on her work, and plaintiff was happy with her evaluation. (*Id.*

---

[10] According to plaintiff's declaration, Castello knitted blankets for two other teachers who were expecting babies, and gave the blankets to plaintiff and the two teachers at a school-organized shower. (Weisbecker Decl. ¶ 81.)

[11] Plaintiff alleges that this was not the first time she was informed that she was on track for tenure, as her evaluation forms stated "Anticipated Tenure Date September 1, 2009." (Pl.'s Ex. F, Sayville Public Schools Staff Evaluation.)

¶ 97.) Castello asked plaintiff about the report cards that were coming due for the second trimester. (*Id.* ¶ 98.) Plaintiff told Castello that she had gone over the report card process with Kara Varga, the substitute teacher. (*Id.* ¶ 99.) Plaintiff told Castello that she did most, if not all, of the assessments. (*Id.* ¶ 101.)

### 6. Second Trimester Report Cards

There was a February "Winter Break" following plaintiff's last day of work. (*Id.* ¶ 103.) When school resumed on February 23, 2009, Varga was the teacher assigned to teach plaintiff's class. (*Id.* ¶ 104.) According to Varga's declaration and deposition testimony, very soon after she began working, she heard teachers in the faculty room discussing student report cards and learned that the report cards were due shortly. (Varga Decl. ¶ 10; Defs.' Ex. 4, Varga Deposition Transcript ("Varga Dep.") at 30.) According to Varga's declaration, prior to hearing this from the other teachers, she was completely unaware that student report cards were coming due; plaintiff had not mentioned this to Varga before going on leave. (Varga Decl. ¶ 10.) According to Varga's declaration, after hearing about the upcoming report cards, Varga checked plaintiff's grade book and also looked in the classroom for any assessments plaintiff might have performed on students before she went on her leave. (*Id.* ¶ 11.) According to Varga's declaration, she found that plaintiff had not completed the report cards and that there was very little data left for Varga to enable her to complete the report cards in plaintiff's absence. (*Id.*) According to plaintiff's deposition testimony, all of the assessments were complete, but the report card grades were not completed before she left. (Defs.' Ex. 1, Weisbecker Dep. at 164-165.)

At plaintiff's deposition, plaintiff admitted that the students' assessments were not in the grade book. (Defs.' 56.1 ¶ 114.) According to plaintiff's declaration, she left other assessments for Varga that have not been produced in the course of this litigation. (Weisbecker Decl. ¶ 124.) According to Varga's declaration, Varga discovered that most of the assessments for the sixty categories of the report card were not in the grade book. (Varga Decl. ¶ 16.) In email correspondence between Varga and Weisbecker, Varga requests the locations of certain assessments, and plaintiff directs Varga to the location of certain assessments. (Pl.'s Ex. G, Email Correspondence.)

In late February or early March of 2009, Varga approached Merilleen Heidrich ("Heidrich"), another teacher at Sunrise Drive, about her concern regarding the report cards. (Defs.' 56.1 ¶ 123.) Varga advised Heidrich that she needed to complete the report cards for her kindergarten class but did not have the information needed to complete the work. (*Id.* ¶ 125.) Varga told Heidrich that the grade book given to her by plaintiff did not contain adequate information to complete the report cards. (*Id.* ¶ 126.) Varga told Heidrich that she did not know the children long enough to complete the entire report card. (*Id.* ¶ 127.) Heidrich advised Varga that she should speak to Castello. (*Id.* ¶ 129.) Heidrich also told Varga that she would help Varga perform the assessments on the students. (*Id.* ¶ 130.) Heidrich helped Varga with a number of math assessments. (*Id.* ¶ 131.) According to Varga's declaration, she estimates that she and Heidrich had to perform thirty of the sixty assessments for the report cards. (Varga Decl. ¶ 16.)

After her conversation with Varga, Heidrich approached Castello and told Castello that Varga had told her that Varga

did not have enough information to complete the report cards. (Defs.' 56.1 ¶ 132.) Varga spoke to Castello sometime in early March 2009. (*Id.* ¶ 135.) Varga told Castello that Varga did not have any complete report card grades or enough information or data to complete the report cards. (*Id.* ¶ 136.) Varga told Castello that many of the assessments for the report cards were not done. (*Id.* ¶ 137.) Varga also informed Castello that plaintiff did not leave her any comments about the students that she could enter into the report cards. (*Id.* ¶ 139.) Castello advised Varga that she should contact plaintiff again to ask her where the information for the report cards might be. (*Id.* ¶ 141.)

After speaking with both Heidrich and Varga, Castello was upset that the work she thought had been done had not been completed by plaintiff. (*Id.* ¶ 144.) Castello believed that asking Varga to assess 24 students in nine days and then translate those assessments into a rubric grade and then write comments was next to impossible. (*Id.* ¶ 145.) Castello believed that plaintiff was the person who should have done (and needed to do) the assessments and complete the report cards. (*Id.* ¶ 148.)

### 7. The School District's Response to the Report Card Situation

After speaking with Varga and Heidrich, Castello asked her secretary, Frances Knox ("Knox") to contact plaintiff at home. (Defs.' 56.1 ¶ 153.) Knox called plaintiff's home on March 5, 2009, but plaintiff was not available. (*Id.* ¶¶ 155-156.) Plaintiff returned the call on March 5, 2009, but Castello was out of the building at the time because of a family emergency. (*Id.* ¶ 158.) Knox informed plaintiff that Castello was looking for the report cards for plaintiff's class. (*Id.* ¶ 159.) Plaintiff told Knox that

Varga had the grades, and according to plaintiff's deposition testimony, Knox told her that she did not have to call back and that if Castello had a problem, she would call plaintiff directly. (Defs.' 56.1 ¶ 160; Defs.' Ex. 1, Weisbecker Dep. 139.)

After Knox gave Castello the message on March 6, 2009, Castello asked Knox to call plaintiff again. (Defs.' 56.1 ¶ 162.) According to Knox's declaration, she called plaintiff's home at least five times, but there was no answer; the phone rang and no answering machine picked up.[12] (Knox Declaration ¶ 5.) Knox advised Castello of her attempts to call plaintiff. (Defs. 56.1 ¶ 164.)

After she was unsuccessful in reaching plaintiff, Castello became concerned that the report cards might not be completed. (Defs.' 56.1 ¶ 166.) On the advice of Camilleri, Castello sent plaintiff a letter via certified mail on March 6, 2009 expressing her concern and advising her to contact Castello immediately. (*Id.* ¶¶ 167-68.) On Tuesday, March 10, 2009, Castello's secretary spoke with plaintiff's husband who advised her that plaintiff had gone to the post office to pick up the letter. (*Id.* ¶ 171.) Castello called two numbers for plaintiff on Wednesday, March 11, 2009. (*Id.* ¶ 173.) Castello called plaintiff's home phone without success but left a message on plaintiff's cell phone. (*Id.* ¶ 174.) Castello learned that plaintiff was in touch with Varga and had sent behavior comments, which Castello considered to be unimpressive and very generic. (*Id.* ¶ 176-77.)

On or about March 12, 2009, Castello received a call from Superintendent Jones about the situation. (*Id.* ¶ 181.) Jones had

---

[12] According to plaintiff's deposition testimony, she had a voicemail on her home phone. (Defs.' Ex. 1, Weisbecker Dep. at 131.) Thus, she denies that Knox made these calls.

learned about the report card situation from the Assistant Superintendent for Instruction, Dr. Geraldine Sullivan-Keck. (*Id.* ¶ 182.) Jones contacted Castello and learned that the report cards were not completed by plaintiff, and that many of the assessments that needed to be completed in order to obtain rubric grades for the report cards were also not completed.[13] (*Id.* ¶ 183.) Jones also learned that Heidrich was going into the classroom to assist Varga. (*Id.* ¶ 184.) Jones reviewed the March 6, 2009 letter sent to plaintiff, and asked Castello to send her a memo outlining the situation and information about the plaintiff. (*Id.* ¶ 190.) On March 12, 2009, Castello sent Jones a memo outlining the situation and two other instances where Castello believed plaintiff used poor judgment and was less than honest. (*Id.* ¶¶ 192-93.) Despite these two other issues, Jones' concern in this situation was what she believed to be plaintiff's deliberate failure to complete a task, the student report cards.[14] (*Id.* ¶ 194.)

After receiving Castello's memo, Jones discussed this matter briefly with the Board of Education (the "Board") at an Executive Session on March 12, 2009. (Defs.' 56.1 ¶ 198.) The discussion on the matter was informational, and no action was taken at the meeting. (*Id.* ¶ 199.) At the meeting, it was made clear to Jones that if, in fact, plaintiff had done what was being reported, the Board would likely vote to terminate plaintiff's employment. (*Id.* ¶ 202.) Jones wrote "okay to terminate" next to

Weisbecker's name in her notes from the meeting. (Pl.'s Ex. P, Jones Notes.) Neither Jones nor the Board took any action regarding plaintiff's employment at the March 12, 2009 meeting, because, according to Jones' declaration, she wanted to give plaintiff the opportunity to respond to these allegations, and the Board permitted her to do so. (Defs.' 56.1 ¶ 203; Jones Declaration ("Jones Decl.") ¶ 19.)

On March 19, 2009, Jones sent plaintiff a letter via certified mail, which expressed Jones' displeasure regarding the report card situation. (Defs.' 56.1 ¶ 204.) Jones did not receive a phone call from plaintiff in response to the letter. (*Id.* ¶ 205.) Plaintiff testified that the union told her not to contact Jones, but then later changed its advice and told her to contact Jones.[15] (*Id.* ¶¶ 209, 212.)

Plaintiff emailed Castello on March 24, 2009, and requested an opportunity to speak with Castello on the phone. (Pl.'s 56.1 ¶ 424.) On March 26, 2009, plaintiff called Castello and left a message with Castello's secretary asking Castello to return her call. (*Id.* ¶ 425.) According to plaintiff's declaration, she spoke with her union representative, who suggested that she request to extend her leave. (Weisbecker Decl. ¶ 116.)

Plaintiff sent Jones an email on March 26, 2012; however this email was not received by Jones because Jones does not use the email address, her Sayville email address, to which it was directed. (Pl.'s Ex. R, Email from Weisbecker to Jones, dated March 26, 2009; Jones Decl. ¶ 21; Defs.' 56.1 ¶¶ 188, 214.) According to plaintiff's declaration, she believed that by emailing Jones at her work email address, she would

---

[13] Plaintiff disputes this fact by stating that she completed all of the assessments. (Pl.'s 56.1 Counter Statement ¶ 183.) She does not produce evidence, however, to dispute that Jones heard this information from Castello.

[14] These other two issues did not play a role in Jones' decision to recommend that plaintiff's probationary position be terminated, discussed below; the major factor in Jones' recommendation was plaintiff's failure to complete the report cards on time. (Defs.' 56.1 ¶¶ 195-96.)

[15] According to plaintiff's declaration, the union initially advised her to contact Castello, and not Jones. (Weisbecker Decl. ¶ 108.)

have received the email.[16] (Weisbecker Decl. ¶ 114.)

On March 31, 2009, plaintiff and Castello spoke on the phone. (Defs.' 56.1 ¶ 244.) Castello expressed that she was disappointed in plaintiff's failure to complete the report cards prior to her leave. (*Id.*) Castello told plaintiff that she could have completed the report cards before going on leave, and when plaintiff stated that the computerized grading window was not open prior to her leave, Castello replied that plaintiff could have written the grades down in her grade book for Varga to enter into the computer. (*Id.* ¶¶ 245-46.) Castello told plaintiff that her failure to complete the report cards would impact her tenure. (*Id.* ¶ 251.) Castello told plaintiff that the situation was out of her hands, and there was nothing Castello could do about it. (*Id.* ¶ 252.) According to plaintiff's declaration, Castello also stated that "going on leave while untenured is risky." (Weisbecker Decl. ¶ 120.)

---

[16] In the email, plaintiff wrote,

> I have received the certified letter you sent and I respectfully request that this be added to my personnel file as my response.
>
> I believe this concern regarding the responsibilities of the leave, Kara Varga, has been the result of a lack of communication and a misunderstanding. Some of the quotes and information have been inaccurate. I don't wish to assign any blame; however, the information has been given to Rose Castello by a third party. I have called Rose Castello in an attempt to clarify the situation.

(Pl.'s Ex. R, Email from Weisbecker to Jones, dated March 26, 2009.) On being shown the email at her deposition, Jones noted that she did not consider it to be adequate as it offered no defense to plaintiff's conduct. (Defs.' 56.1 ¶ 215.)

On March 31, 2009, plaintiff wrote a letter to Camilleri, requesting to extend her leave until September 2009. (Pl.'s 56.1 ¶ 433.)

On April 1, 2009, Jones sent plaintiff a letter via certified mail, which stated:

> I regret to inform you that I will be recommending to the Board of Education at the Board of Education meeting, scheduled to take place on May 14, 2009, that your services as a probationary teacher in the Sayville Union Free School District be terminated as of thirty (30) days thereafter. I anticipate that the Board will act on my recommendation at that meeting.
>
> Please be advised that pursuant to section § 3031 of the Education Law (the Fair Dismissal Law) you have the right to make a written request for a written statement of the reasons for my recommendation. To be valid, this written request must be received at least 21 calendar days before the May 14, 2009 meeting. If you make such a request, I am required to provide you with a written statement at least seven days after you request it. You may then file a written response to the statement of reasons with the District Clerk, Mari Demetres. This must be done no later than seven days before the meeting.
>
> If you have any questions concerning the procedure, please contact Rosemary Camilleri in the Personnel Office.

(Defs.' 56.1 ¶ 217.) Jones received no response from plaintiff to her April 1, 2009

letter.[17] (*Id.*¶ 218.) Plaintiff never made any attempt to call Dr. Jones about this situation. (*Id.*¶ 219.) At no point did plaintiff advise the School District, in writing, what her position was in response to the letters of March 6, March 19, and April 1. (*Id.* ¶ 220.) Plaintiff did not contact anyone on the Board of Education. (*Id.* ¶ 255.)

### 8. Plaintiff's Resignation

In response to Dr. Jones' April 1, 2009 letter, plaintiff consulted with her private attorney and union representative and elected to resign. (*Id.* ¶ 256.) On April 27, 2009, plaintiff's union representative sent an email to the School District offering plaintiff's resignation. (*Id.* ¶ 257.) On April 29, 2009, plaintiff submitted a letter of resignation. (*Id.* ¶ 262.)

### B. Procedural Background

Plaintiff filed the complaint in this action on October 12, 2010. Defendants answered the complaint on January 6, 2011. Plaintiff filed an amended complaint on October 27, 2011. Defendants answered the amended complaint on November 17, 2011. On February 22, 2012, defendants moved for summary judgment. Plaintiff submitted her opposition on March 23, 2012. Defendants submitted their reply on April 6, 2012. The Court held oral argument on June 19, 2012.

---

[17] According to plaintiff's declaration, her union representative advised her that he would speak to Jones on her behalf and that, even if plaintiff provided a written request for the reasons Jones was recommending plaintiff for termination, it would not be enough to prevent her from recommending that plaintiff's position be terminated. (Weisbecker Decl. ¶ 132.) The union representative advised plaintiff not to file a grievance against Castello or Jones. (*Id.*) Although hearsay, the Court also notes that plaintiff stated in her deposition that her union representative informed her that he tried to procure a Juul agreement, which would have extended her probationary status for an additional year, but was denied. (Defs.' Ex. 1, Weisbecker Dep. at 239.)

The Court has fully considered the submissions of the parties.

### II. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (emphasis in original)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S. Ct. 2505 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48, 106 S. Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g.*, *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)).

### III. DISCUSSION

Defendants moved for summary judgment on the following grounds: (1) plaintiff cannot state a *prima facie* case of gender discrimination because (a) plaintiff did not suffer an adverse employment action, (b) there was no constructive discharge, and/or (c) there is no inference of discrimination; (2) Jones' recommendation of termination was based on legitimate, non-discriminatory reasons; (3) plaintiff's state Human Rights Law claims must be dismissed as (a) there is insufficient evidence that the District condoned discrimination, and/or (b) the claims are untimely; and (4) plaintiff's claim for punitive damages and front pay must be dismissed.

For the reasons set forth below, the Court grants defendant's summary judgment

motion with respect to plaintiff's Title VII claim because plaintiff has failed to produce evidence to establish a *prima facie* case with respect to this claim. Specifically, plaintiff has failed to produce evidence that she suffered an adverse employment action. In any event, even if plaintiff were able to establish a *prima facie* case, Jones' recommendation of termination was based on legitimate, non-discriminatory reasons, and plaintiff has not met her burden to show that the decision to terminate was motivated by a discriminatory reason. Because the Court disposes of plaintiff's claim on these grounds, the Court does not address defendants' arguments with respect to punitive damages and front pay. Moreover, in light of the dismissal of the federal claim, the Court declines to exercise supplemental jurisdiction over plaintiff's state law claims.

## A. Plaintiff's Title VII Claim

### 1. Applicable Law

Title VII prohibits discrimination against an employee based on her gender. *See* 42 U.S.C. § 2000e-2(a). Here, plaintiff claims she has been discriminated against by defendant on the basis of her gender.

The "ultimate issue" in any employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason," i.e., that there was discriminatory intent. *Fields v. N.Y. State Office of Mental Retardation & Dev'l Disabilities*, 115 F.3d 116, 119 (2d Cir. 1997); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146 (2000). In the absence of direct evidence of discrimination, a plaintiff in an employment discrimination case usually relies on the three-step *McDonnell Douglas* test. First, a plaintiff must establish a prima facie case of unlawful discrimination by

showing that (1) he is a member of a protected class (2) who performed his job satisfactorily (3) but suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination (or retaliation). *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 802 n.13 (1973) (noting that elements of prima facie case vary depending on factual circumstances); *Stratton v. Dep't for the Aging for the City of New York*, 132 F.3d 869, 879 (2d Cir. 1997).

Second, if the plaintiff establishes a prima facie case, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision." *Stratton*, 132 F.3d at 879; *see Reeves*, 530 U.S. at 142-43. The purpose of this step is "to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent." *Fisher v. Vassar College*, 114 F.3d 1332, 1335-36 (2d Cir. 1997) (en banc), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000).

Third, if the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993) (citation omitted); *see also James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason. *See Fields*, 115 F.3d at 120-21; *Connell v. Consol. Edison Co.*, 109 F. Supp. 2d 202, 207 (S.D.N.Y. 2000).

To meet this burden, the plaintiff may rely on evidence presented to establish his prima facie case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003). It is not sufficient, however, for a plaintiff merely to show that he satisfies "*McDonnell Douglas*'s minimal requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." *James*, 233 F.3d at 157. Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.*; *Connell*, 109 F. Supp. 2d at 207-08.

As the Second Circuit observed in *James*, "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove – particularly discrimination." 233 F.3d at 157; *see also Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

## 2. No Evidence of an Adverse Employment Action

### a. Jones' Recommendation Was Not an Adverse Employment Action

A plaintiff suffers an adverse employment action when she experiences a "materially adverse change in the terms and conditions of employment." *Richardson v. N.Y. State Dep't of Corr. Servcs.*, 180 F.3d 426, 446 (2d Cir. 1999), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006), (quoting *Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir. 1997)). Typical adverse employment actions may include termination from a job, decrease in salary, material reduction in benefits or responsibilities, or a less distinguished title. *See Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). Changes in assignments or duties that do not "radical[ly] change" the nature of work are not typically adverse employment actions. *See Galabya*, 202 F.3d at 641 (quoting *Rodriguez v. Bd. of Educ.*, 620 F.2d 362, 366 (2d Cir. 1980)).

Although the burden of establishing a prima facie case is minimal, plaintiff has failed to put forth evidence that would allow a rational factfinder to conclude that plaintiff was subjected to an adverse employment action. In other words, even if plaintiff's version of the evidence is credited, she has failed to point to any conduct that could constitute an adverse employment action as a matter of law that would support a claim for gender discrimination.

In plaintiff's opposition papers, she argues that she "endured several adverse actions starting in June 2008." (Pl.'s Opp. at 14.) These actions included: (1) being reassigned to kindergarten, (2) receiving the smallest of the three kindergarten classrooms, (3) being assigned M.N., the student with Down Syndrome, as a student without special services, and (4) not receiving adequate aide time. At oral argument, plaintiff's counsel conceded that these actions are not adverse employment actions actionable under Title VII. The Court agrees. Not receiving a requested or

desired assignment is not an adverse employment action. *See Bright v. LeMoyne Coll.*, 306 F. Supp. 2d 244, 254 (N.D.N.Y. 2004) (holding that being given a different shift than the one requested is not an adverse employment action). In addition, receiving a smaller classroom, teaching a special needs student, and receiving inconvenient aide time were not materially adverse changes to the conditions of plaintiff's employment. *See Galabya*, 202 F.3d at 640 ("To be 'materially adverse' a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" (quoting *Crady*, 993 F.2d at 136)).[18]

With respect to Jones' recommendation to the Board that plaintiff be terminated as a probationary teacher, based on the evidence in the record in this case, this was not an adverse employment action as a matter of law. Threats of termination do not, by themselves, constitute an adverse employment action. *See Murray v. Town of N. Hempstead*, --- F. Supp. 2d ----, No. 09-cv-4120(ADS)(ARL), 2012 WL 43645, at *19 (E.D.N.Y. Jan. 6, 2012) ("As an initial matter, threats of termination cannot, by themselves, constitute an adverse employment action."); *Tompkins v. Allied Barton Sec. Servs.*, No. 09 Civ. 1954(RMB)(JLC), 2010 WL 3582627, at *5

n.6 (S.D.N.Y. Aug. 2, 2010) ("Plaintiff appears further to claim that Bermudez threatened her with termination. The vast majority of courts in this circuit have held that a threat alone does not constitute an adverse employment action." (citation omitted)), *aff'd*, 424 F. App'x 42 (2d Cir. 2011); *Early v. Wyeth Pharms., Inc.*, 603 F. Supp. 2d 556, 574 (S.D.N.Y. 2009) ("A threat is not, by itself, an adverse employment action. Rather, an adverse employment action must affect ultimate employment decisions such as promotion, wages, or termination." (internal quotation marks and citations omitted)); *Bowles v. N.Y.C. Transit Auth.*, No. 00 Civ. 4213(BSJ)(MHD), 2006 WL 1418602, at *10 (S.D.N.Y. May 23, 2006) ("In this Circuit, most courts that have faced the issue have decided that an unrealized threat of discipline or termination is not actionable under Title VII." (collecting cases)). This is especially true in the instant case, where (1) the recommendation was made by Jones, who was not the final decision maker with respect to termination, (2) plaintiff was notified of the recommendation of termination well in advance of the Board's meeting, and (3) plaintiff was afforded extensive process under New York Education Law § 3031 to request Jones' reasons for the recommendation and provide a responsive statement to the Board.[19] *See*

<hr>

[18] In addition, the Court notes that it is uncontroverted that (1) the classroom that plaintiff used in the 2008-2009 school year was the same one she had used in 2005-2006 and 2006-2007, and (2) plaintiff's salary, hours, and benefits as a kindergarten teacher were the same for any other teacher at Sunrise Drive. More importantly, all of these events occurred *before* her pregnancy and subsequent leave. Thus, even assuming *arguendo* that plaintiff attempted to continue to argue (notwithstanding the concession at oral argument) that these events could constitute adverse employment actions, no rational jury could conclude that they related to her pregnancy and subsequent leave, and were a pretext for discrimination.

[19] To the extent plaintiff argues that her termination was a foregone conclusion based on Jones' notation that it was "okay to terminate" plaintiff at the March 12, 2009 meeting, the Court notes that Jones did not have decision-making authority, either at the March 12, 2009 meeting or at any point after that meeting, to terminate plaintiff. In addition, Jones attempted to contact plaintiff in the March 19 letter with respect to the report card problems. Plaintiff was afforded process under Education Law § 3031 to contest the recommendation, which plaintiff declined to invoke. The record does not support the plaintiff's argument that the notation (of which plaintiff was unaware) demonstrates plaintiff's termination was a foregone conclusion, such that the mere threat of termination

generally *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333 (7th Cir. 2004) ("Public schools must offer notice and an opportunity to be heard as a matter of constitutional law. It would be odd for courts to say something like: 'Well it's all a sham, so we'll treat the commencement of the process as a final decision to discharge.' Then why have the give-and-take at all?" (citation omitted)). As such, as a matter of law, the recommendation was not an adverse employment action under the particular circumstances of this case, and no rational jury could find otherwise.

### b. Jones' Recommendation Was Not a Constructive Discharge

Nor is Jones' recommendation of termination a constructive discharge. Constructive discharge occurs in the absence of a "discrete, identifiable act," when an employer, "'rather than directly discharging an individual, intentionally creates an intolerable atmosphere that forces an employee to quit voluntarily.'" *Flaherty v. Metromail Corp.*, 235 F.3d 133, 138 (2d Cir. 2000) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996)); *see also Morris v. Schroder Cap. Mgmt. Int'l*, 481 F.3d 86, 89 (2d Cir. 2007) (stating that constructive discharge "occurs 'when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" (quoting *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983))). Working conditions are sufficiently "intolerable" when they are "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987) (quoting *Pena*, 702 F.2d

at 325). When such conditions are present, the court will treat the plaintiff's voluntary resignation "as if the employer had actually discharged the employee" for the purpose of establishing a *prima facie* case of discrimination. *Id.* (applying the doctrine of constructive discharge to a discrimination claim filed under 42 U.S.C. § 1981).

As a threshold matter, plaintiff was on leave during the time of the recommendation, so plaintiff's "working conditions" could not have been so intolerable that the plaintiff was forced into an involuntary resignation. With respect to Jones' recommendation that the Board terminate plaintiff's probationary status, this action does not constitute a constructive discharge, especially in light of plaintiff's ability to request reasons for the recommendation from Jones and submit a response to the Board. *See Bailey v. N.Y.C. Bd. of Educ.*, 536 F. Supp. 2d 259, 266 (E.D.N.Y. 2007) ("when an employee resigns rather than respond to disciplinary charges, the resignation cannot later be construed as a constructive discharge."); *Silverman v. City of New York*, 216 F. Supp. 2d 108, (E.D.N.Y. 2002) ("the fact that [plaintiff] could have sought a hearing before being terminated eviscerates his claim that threats of termination created an 'intolerable' situation which left him with but one choice: resignation."), *aff'd*, 64 F. App'x 799 (2d Cir. 2003).

In plaintiff's opposition brief, plaintiff argues that threats of termination alone have been held to permit a rational trier of fact to find that a reasonable person in the employee's shoes would have felt compelled to resign. (Pl.'s Opp. at 16.) However, even the cases cited by plaintiff acknowledge that "although threats of termination alone have occasionally been held to be sufficient to permit a rational trier of fact to find that a reasonable person in the employee's shoes

constituted an adverse employment action under Title VII.

would have felt compelled to resign, those cases involved [ ] direct and/or repeated threats from the employer, along with some other adverse conduct." *Murray*, 2012 WL 43645, at *20 (citing *Valdes v. New York City Dep't of Env. Prot.*, No. 95 Civ. 10407, 1997 WL 666279, at *2 (S.D.N.Y Oct. 27, 1997) (finding a triable issue of fact as to whether constructive discharge occurred because plaintiff's supervisors told him on multiple occasions "do you want to keep [your] job", that they would "make [his] life miserable", that "it was best if [he] resigned" because he "was going to be terminated"); *Grey v. City of Norwalk Bd. of Educ.*, 304 F. Supp. 2d 314, 324 (D. Conn. 2004) (variety of circumstances made her situation "intolerable," including: the repeated threat that her position would be eliminated; a rumored letter announcing her termination; petty reprimands; and suggestion that the District buyback her contract and [superintendent's] subsequent comment that she should consider herself "finished.")).

Here, plaintiff argues that the recommendation of termination, coupled with Castello's statement that failure to complete the report cards would impact her tenure, constitutes a constructive discharge. Even evaluating plaintiff's claims under the cases cited by plaintiff, these comments do not rise to the level of direct, repeated threats coupled with adverse conduct found to constitute a constructive discharge. In addition, plaintiff had an opportunity to request and contest the reasons for Jones' recommendation and failed to do so. Given the uncontroverted evidence, no rational jury could find a constructive discharge in this case.

### 3. No Evidence of Discrimination

Even assuming *arguendo* that plaintiff could establish a prima facie case, her claim

of employment discrimination could still not survive summary judgment because defendants have articulated a non-discriminatory reason for the termination, and, as discussed below, no rational jury could conclude that the reason given by the defendants was a pretext for discrimination.

### a. Applicable Law

As noted *supra*, under the *McDonnell-Douglas* burden-shifting framework, if the plaintiff establishes a prima facie case, the burden shifts to the defendant "'to articulate some legitimate, nondiscriminatory reason'" for the adverse employment action. *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996)). If the defendant carries that burden, "the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

To meet this burden, the plaintiff may rely on evidence presented to establish her prima facie case, as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003). It is not sufficient, however, for a plaintiff merely to show that she satisfies "*McDonnell Douglas*'s minimal requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000). Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue – whether the record contains

sufficient evidence to support an inference of discrimination. *See id.*

## b. Application

Here, there is no such evidence. Defendants contend that Jones recommended plaintiff's termination because of her failure to complete or provide for the efficient completion of the second trimester report cards before plaintiff's leave. This is a legitimate, non-discriminatory reason to recommend termination. *See, e.g.*, *Habe v. 333 Bayville Ave. Restaurant Corp.*, No. 09-CV-1071(JS)(ETB), 2012 WL 113501, at *3 (E.D.N.Y. Jan. 13, 2012) ("an employee's poor performance is a legitimate, nondiscriminatory reason to discharge that employee").

As evidence that the proffered reason was pretext, plaintiff argues that Superintendent Jones' investigation of the report card incident was based on incomplete information and hearsay, and failed to provide plaintiff with alternative options to complete the report cards or maintain her probationary status. (Pl.'s Opp. at 20-21.) However, the Court concludes that those arguments have no merit, and no rational juror could find pretext from this evidence.

### i. Jones' Investigation

To the extent plaintiff alleges that Jones' investigation was flawed, "a faulty investigation is not in and of itself evidence of pretext." *Sharpe v. Utica Mut. Ins. Co.*, 756 F. Supp. 2d 230, 250 (N.D.N.Y. 2010) (citing *Rodriguez v. City of N.Y.*, 644 F. Supp. 2d 168, 187 (E.D.N.Y. 2008) ("[T]he fact that an employee disagrees with the results of an employer's decision regarding termination, or even has evidence that the decision was objectively incorrect or was

based on faulty investigation, does not automatically demonstrate, by itself, that the employer's proffered reasons are a pretext for termination.")). In *Rodriguez*, the Court stated,

> in circumstances where the veracity of the employer's explanation and/or the thoroughness of the investigation is disputed, the Court should examine the entire record to determine whether there is evidence from which a reasonable jury could conclude that the deficiencies in the employer's investigation and/or the incorrect conclusion reached by the employer can be attributed to a discriminatory motive.

*Rodriguez*, 644 F. Supp. 2d at 187. Here, there is nothing in the record to suggest that Jones' decision can be attributed to a discriminatory motive.[20] As an initial matter,

---

[20] In plaintiff's opposition papers, plaintiff points to two alleged comments by Castello – namely, (1) when plaintiff told Castello about her first pregnancy, Castello allegedly said she had "good timing" because her baby was due in June, and (2) Castello allegedly told plaintiff that "going on leave while untenured is risky" – and suggests that they support an inference of discrimination. However, the Court disagrees for several reasons. First, it is uncontroverted that Jones (not Castello) made the recommendation for termination. Thus, any alleged comments by Castello do not support an inference of gender discrimination. Second, the uncontroverted evidence is that, among other things, (1) Castello, at a time when she was aware in May 2008 that plaintiff wanted to get pregnant again, recommended plaintiff to be promoted to a vacant probationary position for the 2008-09 year, which plaintiff then obtained; (2) at the end of the 2007-2008 school year, plaintiff sent a handwritten note to Castello stating, "Thank you for a great year. You have always been supportive of me and I really appreciate it. . . ."; (3) in or about January 2009, prior to plaintiff commencing her maternity leave in February 2009, Castello personally knitted a baby blanket for plaintiff's expected child; and (4) on February 12, 2009 (which was the day before plaintiff's maternity leave), Castello met with

the record is devoid of any comments or actions whatsoever by Jones indicating that she had a discriminatory animus against untenured teachers taking maternity leave. With respect to the investigation, nothing suggests that Jones' actions can be attributed to a discriminatory motive. Jones' investigation was based on information from Sullivan-Keck and Castello, two administrators in the District. The Court also notes that Jones afforded plaintiff an opportunity to explain the situation through the March 19 letter, but Jones received no response.[21] In addition, plaintiff has not produced evidence of investigations of other similarly situated teachers that were conducted more thoroughly. Moreover, plaintiff has failed to point to evidence of any similarly situated teacher (or any other employee in the District) – tenured or non-tenured – who has been terminated after

taking a leave of absence based on pregnancy.[22]

The Court notes that "absent discrimination, an employer may fire an employee 'for a good reason, a bad reason, a reason based on erroneous facts, or no reason at all.'" *Droutman v. N.Y. Blood Cent., Inc.*, No. 03-CV-5384(DRH/ARL), 2005 WL 1796120, at *9 (E.D.N.Y. July 27, 2005) (quoting *Mohamed v. Marriott Int'l, Inc.*, 905 F. Supp. 141, 155 (S.D.N.Y. 1995)). "An employer's good faith *belief* that an employee engaged in misconduct is a legitimate reason for terminating her, and the fact that the employer is actually wrong is insufficient to show that the alleged misconduct is a pretext for discrimination." *Id.* Plaintiff has not met her burden of establishing that Jones' investigation supports an inference of discrimination. In short, there is simply no evidence in the record from which a rational jury could find that the reasons for the employment decision by the District were a pretext for gender discrimination.

ii. Failure to Accept Juul Offer

Plaintiff also alleges that Jones failed to accept the union representative's offer of a Juul agreement, and that this somehow suggests gender discrimination. (Pl.'s Opp. at 20.) As an initial matter, plaintiff's evidence regarding the Juul agreement is hearsay, and thus the Court need not consider this evidence. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("only

---

plaintiff and advised plaintiff that her teaching evaluations were good and that she was on track for tenure. Given these uncontroverted facts, no rational jury could possibly conclude that Principal Castello's later investigation of plaintiff's failure to complete grading information before taking her maternity leave was based on gender discrimination. In fact, when asked at oral argument to identify the individual who allegedly had the discriminatory animus, plaintiff's counsel stated it was Jones, and that Castello "loved [his] client." However, counsel was unable to cite evidence in the record (and the Court is aware of none) to support this claim, as discussed above. Plaintiff's counsel then revised his position and stated that Castello was not acting with a discriminatory animus until Jones became involved in the report card situation; according to plaintiff's counsel, she then "flipped." Such a conclusory and shifting argument of discriminatory animus, with no evidence in the record to support it, does not allow the claim to survive summary judgment.

[21] Although plaintiff apparently submitted an email to Jones (which she did not receive because of the email address), Jones testified at her deposition that the email would not have made a difference in her decision. In any event, even assuming *arguendo* that Jones' recommendation of termination was based in part on a mistaken belief that plaintiff failed to respond to repeated inquiries, such motive is not discriminatory.

[22] In fact, the uncontroverted evidence is that the District has given leaves of absences to dozens of individuals over the years for pregnancy. For example, the absences that plaintiff filled over the years as a leave replacement teacher was largely due to a teacher, Gina Romano, who was given a 6-year leave of absence when her two children were born. Similarly, plaintiff's initial leave position in 2004-2005 was to fill in for Suzanne Jones who was taking a leave of absence because of her pregnancy.

admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.").

In any event, even if the evidence regarding the Juul agreement was admissible, nothing in the record suggests that Jones' decision to decline the Juul agreement, in light of Jones' belief that plaintiff had failed to complete or easily facilitate the completion of her report cards, is pretextual. As stated *supra*, the decision to recommend termination was based on legitimate, non-discriminatory motives, and plaintiff has failed to demonstrate that Jones' investigation demonstrates pretext. As a result of Jones' investigation, Jones determined that she would recommend to the Board that plaintiff's probationary status be terminated. Jones' refusal of a proposed Juul agreement is consistent with her recommendation that plaintiff's probationary status be terminated. In addition, plaintiff has produced no evidence of a similarly situated teacher who received a Juul agreement under similar circumstances. In light of all of the facts in the record, construed most favorably to plaintiff, no rational jury could find that Jones' refusal of the Juul agreement was discriminatory.[23]

---

[23] Although plaintiff also attempts to argue that the fact that the District made accommodations with respect to the timing of the grades for two other teachers in the past, that argument is utterly lacking in merit. (Pl.'s Opp. at 20-21.) One teacher's child died and the teacher's grades were still sent home to the students, but without comments. (Pl.'s Ex. M, Castello Deposition Transcript, at 46-47.) In the second case, the teacher was leaving on maternity leave and requested in advance that she submit her grades early, which the District permitted. (*Id.* at 46.) These instances simply provide absolutely no reasonable inference of gender discrimination. In fact, if anything, the second situation demonstrates that the District, rather than being hostile to teachers leaving on maternity leave, is willing to make

## B. New York State Claims

Plaintiff's complaint also asserts causes of action under New York State Human Rights Law. Defendants argue that the Human Rights Law claims are untimely and, in any event, there is no proof the District condoned any discrimination.

Having determined that the federal claims do not survive summary judgment, the Court concludes that retaining jurisdiction over any state law claims is unwarranted. 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). "In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.'" *Birch v. Pioneer Credit Recovery, Inc*., No. 06-CV-6497T, 2007 WL 1703914, at *5 (W.D.N.Y. June 8, 2007) (quoting *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir. 1986)).

Therefore, in the instant case, the Court, in its discretion, "'decline[s] to exercise supplemental jurisdiction'" over plaintiff's state law claims because "it 'has dismissed all claims over which it has original jurisdiction.'" *Kolari v. N.Y.-Presbyterian Hosp*., 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)); *see also Cave v. E. Meadow Union Free Sch. Dist*., 514 F.3d 240, 250 (2d Cir. 2008) ("We have already found that the district court lacks subject matter jurisdiction over appellants' federal claims. It would thus be clearly inappropriate for the district court to retain jurisdiction over the state law claims when there is no basis for supplemental jurisdiction."); *Karmel v. Claiborne, Inc.,*

---

accommodations where requested in advance and the grades are still completed.

No. 99 Civ. 3608 (WK), 2002 WL 1561126, at *4 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

Accordingly, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to retain jurisdiction over the remaining state law claims given the absence of any federal claims that survive summary judgment and dismisses such state claims without prejudice.

## IV. CONCLUSION

For the foregoing reasons, the Court grants the defendants' motion for summary judgment with respect to plaintiff's Title VII claim. The Court declines to exercise supplemental jurisdiction over the state law claims, and dismisses the state law claims without prejudice. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 12, 2012
        Central Islip, NY

* * *

Plaintiff is represented by Deborah Lee Rubin and James Aldo Agnini, Valli, Kane & Vagnini, 600 Old Country Road, Suite 519, Garden City, NY 11530. The attorneys for defendants are Mark N. Reinharz and Jessica C. Satriano, Bond Schoeneck & King, PLLC, 1399 Franklin Avenue, Garden City, NY 11530.